IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SHERRY JONES ) | |
| ) | |
| v. ) | No. 1:12-0105 |
| ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To: The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for disability insurance benefits and supplemental security income, as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which defendant has responded (Docket Entry No. 13). Plaintiff has further filed a reply brief (Docket Entry No. 16), to which defendant has filed a sur-reply (Docket Entry No. 19). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Introduction

Plaintiff filed her claims to benefits on November 29, 2007, alleging that she became disabled on July 5, 2006, as a result of her degenerative disc disease, depression, anxiety, and panic attacks. (Tr. 143) Her claims were denied at the initial and reconsideration stages of state agency review, whereupon plaintiff filed a request for de novo hearing and decision by an Administrative Law Judge (ALJ). An administrative hearing was held on May 24, 2010, at which plaintiff appeared without counsel. (Tr. 32-64) Plaintiff testified, as did an impartial vocational expert. At the conclusion of the hearing, the ALJ closed the record and took the matter under advisement, until June 21, 2010, when he issued a written decision in which plaintiff was found to be not disabled. (Tr. 15-27) That decision contains the following enumerated findings:

1. The claimant met the insured status requirements of the Social Security Act through March 31, 2010.

2. The claimant has not engaged in substantial gainful activity since July 5, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: type II diabetes; disc herniation at L4-5 with lower back pain; depression; anxiety; and post traumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) that is limited to occasionally and frequently lifting and/or carrying ten pounds; sitting in 25 minute intervals; standing and/or walking in one hour intervals; a sit/stand at will

      option every 25 minutes; simple one and two step repetitive tasks; frequent interaction with the public and co-workers; and non-confrontational interaction with supervisors.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on February 13, 1971 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from July 5, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-18, 25-26)

On June 21, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-6), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. <u>Id.</u>

## II. Review of the Record

The following record review is taken from pages 6-10 of the ALJ's decision. (Tr. 20-24)

The claimant underwent an anterior cervical diskectomy and fusion at C6-7 in September 1994 due to a herniated nucleus pulposus. Postoperatively, the claimant reported 50-60% relief of her radicular pain and numbness. In October 1994, she reported some numbness in the right index finger, but the pain was gone. Radiology reports indicated good placement of the graft with bony consolidation at both endplates. It was noted that she was having some trouble coping with the medical problems she was experiencing. During this time, she was medically restricted from working. Exhibit lF.

In January 1995, her physician stated that she had reached maximum medical improvement and fell into the cervicothoracic category III with 15% of whole person impairment. He advised a permanent restriction of lifting greater than 30 pounds and permanent restrictions which would preclude repetitive lifting and repetitive motion of the arms or neck at or above the shoulder level. Repetitive motion of the neck in a flexed position should also be avoided. Exhibit lF.

On her first day back to work in January 1995, she reported pain into her right hip and thigh region and some continuing posterior neck pain that was activity-limiting for her. She was diagnosed with trochanteric bursitis right hip. Exhibit 1 F.

In June 199 5, treatment notes indicate that the claimant had a good solid fusion but continued to have a large amount of axial neck pain with occasional occurrences of recurrent radicular pain. Her physician stated that she experienced prominent symptoms of situational depression. Exhibit lF.

The claimant is next evaluated in January 1996 when she reported essentially complete relief of radicular pain but continued to have mid cervical posterior pain. A physical examination showed a mildly restricted motion of the neck especially in regard to flexion. She retained full strength in the bilateral upper extremities. Radiology reports showed a solid C5-6 fusion but some over distraction of the facet joints. She received a steroid injection and was referred for bilateral C5-6 facet blocks. Exhibit lF.

In April 1996, the claimant reported only two days relief from the facet block. The medical impression was status post C5-6 anterior cervical fusion with residual posterior neck pain. Exhibit lF.

Treatment notes from January 1997 show that the claimant suffered a direct trauma to the back of her neck and was complaining of posterior neck pain with some intermittent radiation of pain into both her arms. A physical exam revealed good motion of the neck; well healed anterior cervical fusion scar; biceps, triceps, and brachioradialis were all 2/4; manual motor testing was 5/5 except for shoulders where her deltoids were reduced to 4/5 and bothered secondary to pain. She was started on the medication Lodine and advised to treat with heat and isometrics to the neck. Exhibit 1 F.

The next treatment note is dated October 2002 when the claimant was evaluated for neck pain, headache, and low back pain stemming from a motor vehicle accident. She also reported poor memory and difficulty with multi-tasking. She stated that she is anxious about riding in automobiles and, at times, becomes incapacitated by anxiety and fear. Her medications included Neurontin, Zanaflex, and Bextra. The medical impressions were soft tissue injury to cervicothoracic area, musculoskeletal headache, probable sacroiliac joint sprain, and post traumatic stress disorder. Exhibit 1 F.

In December 2002, the claimant reported that she was feeling and moving better and taking far less of the medications Bextra and Zanaflex. Exhibit 1 F.

The next treatment note is dated November 2005 when the claimant was evaluated for neck pain. She reported having a job that required frequent above the shoulder work. Her cervical motion was mildly restricted in forward flexion but full in rotation and extension. A motor exam was normal in her bilateral upper extremities. Her physician placed her on work restrictions involving no repetitive work or even more than occasional work at or above shoulder level which should not be continuous for more than one hour and no lifting more than thirty pounds on an occasional basis. He stated that she could return to permanent light duty work. Exhibit lF.

The claimant was seen at a follow up exam in February 2006 when she complained of neck spasms. ACT scan of her head was normal. The impression was myofascial pain in the neck with spasm. She received a refill prescription of Zanaflex and encouraged to try Arthrotec. Exhibit lF.

During June 2006, the claimant was treated for a left elbow and wrist injury. She received a wrist splint, and her medications included Naprosyn, Lexapro, Claritin, Pepcid, and Estroven. She was placed on light work duty for three days. Exhibit 2F.

Due to complaints of lower back pain with radiation into the hips and legs, an MRI of the lumbar spine was performed in July 2006 which revealed at L3-4 a central left paracentral broad based disc protrusion/small herniation and mild narrowing of the inferior left neural foramen with mild facet hypertrophy; at L4-5 a central left paracentral broad based disc herniation, narrowing of the left lateral recess and mass effect on the left L5 nerve root with a loss of disc height and desiccation of the disc; and at L5-Sl a central disc

protrusion/herniation and mass effect on the anterior thecal sac with no appreciable impingement of nerve roots. Exhibits lF, 4F.

In August 2006, the claimant received lumbar steroid injections. Exhibits lF, 4F. Medical records from Family Health Group show a refill of the medication Prozac. Exhibit 2F.

In September 2006, it was noted that the claimant's back pain with radiation into her hips and legs had failed to improve with a full course of conservative measures. Therefore, she underwent a microlumbar discectomy at L4-5. The claimant was medically excused from work during this period. Her past medical history reported that the claimant has type II diabetes and anxiety attacks. Exhibits 3F, 4F.

Postoperatively, she reported a significant amount of pain and discomfort although she was ambulating better. She was released back to work as of January 2, 2007. Exhibit 4 F.

There are no medical records documenting treatment of any kind since January 2007. At the hearing, the claimant testified to the following: she has had no treatment for physical or mental issues since late 2006 when she lost her insurance; she is unable to lift her 13-pound dog without difficulty; she can sit about 20-25 minutes, stand about an hour, and walk slowly through Wal-Mart which takes about 60 to 90 minutes; she recently began mental health treatment in April 20 10 and has attended two appointments; she moved back in with her parents to care for her mother; she left her last job due to back pain; she tried returning to work for 4 hours per day but was unable to perform her job; she prepares meals and does housework while taking time to rest; about one year ago, she tried to get a job at Kroger, Dollar General, and Wal-Mart but was not hired; and she would try a job that required sitting most of the day, but she did not think she was qualified for those positions.

As for the opinion evidence regarding the claimant's physical limitations, a consultative examination was performed in January 2008 by Darrel Rinehart, M.D., who reported that the claimant walked very slowly and had a slight limp favoring her right leg. She had 35° anterior lumbosacral flexion, lateral flexion was 15° in either direction, and she had 5-10° extension of the lumbosacral spine. Exhibit *SF.*

Dr. Rinehart evaluated the claimant again in March 2008. The claimant reported chronic pain but only took the medication Zanaflex on an as needed basis. She had no insurance and was unable to have steady, regular follow up treatment. She reported that she can sit 30-45 minutes; stand 20-35 minutes; hardly lift up to 20 pounds; and walk approximately half of a mile. She was able to drive occasionally. Exhibit 9F.

A physical examination revealed a well developed, well nourished female; alert and oriented; blood pressure of 106/66; pulse 80; weight of 155.7 pounds; and height of 61.5"; pupils equal and round; vision was 20/40 in the right eye and 20/20 in the left eye; carotids are 2+ without bruits; lungs clear without rales, rhonchi, or wheezing; pulses were 2+ and symmetrical bilaterally; no clubbing, cyanosis, or edema in the extremities; ranges of motion in hands, wrists, elbows, shoulders, neck, feet, ankles, and knees were normal; and lumbosacral spine had flexion to approximately 70°, lateral flexion was 25°, and extension was 15°. The claimant got up and down from the table without difficulty. She walked slowly, but with a normal station and gait. She was able to get up on her heels and toes and do heel to toe walking and squat and rise. Her cranial nerves were intact, and the sensory exam was intact. Reflexes were 2+ and symmetrical, and muscle strength testing was 4/5 in all muscle groups. Exhibit 9F.

Dr. Rinehart's assessments were chronic back pain with past surgery and a history of

anxiety, depression, and panic attacks. He stated that the claimant had reasonably good mobility and performed all maneuvers requested; therefore, his opinion was that she had no impairment related physical limitations. Exhibit 9F.

Two Physical Residual Functional Capacity Assessments were completed by State Agency medical consultants. In April 2008, Linda Caldwell, M.D., reviewed the evidence and reported that the claimant could occasionally lift and/or carry twenty pounds occasionally and ten pounds frequently; stand, walk, and/or sit about six hours in an eight-hour workday; and occasionally crouch, stoop, and climb ladders/ropes/scaffolds. Exhibit 1 OF. In August 2008, Joe Allison, M.D., reported that the claimant could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand, walk, and/or sit about six hours in an eight-hour workday; and frequently climb, balance, stoop, kneel, crouch, and crawl. Exhibit llF.

* * *

Opinion evidence regarding mental limitations consists of a psychological consultative examination performed in January 2008 by Deborah Doineau, Ph.D. The claimant reported that she had taken the medications Lexapro and Wellbutrin in 2005 or 2006 when prescribed by her primary care physician. She reported that the medications helped reduce some symptoms of depression. She stopped taking the medications in 2007 when she lost her insurance. She reported treatment with a psychologist in 2002 while living in Colorado due to anxiety while driving a vehicle. She reported continued occasional anxiety, but her condition had improved. She had never been admitted to a psychiatric hospital for treatment, but endorsed thoughts of suicide back in 2002 during marital difficulties. She had never made a suicide attempt. The claimant described herself as a loner

9

type, although she typically got along with others on the job while keeping to herself. Exhibit 6F.

During the evaluation, the claimant presented with speech that was clear, coherent, and goal directed, but somewhat sparse. There was some delay in her responses. She did not elaborate when asked questions. She was oriented to person, time, place, and situation. Memory seemed intact. Affect was within normal range, and her mood was mildly anxious. She described feeling "apprehensive." There was no evidence of psychosis. She denied experiencing auditory or visual hallucinations, and there was no evidence of delusions. Thought processes did not reveal loosening of associations, circumstantial, or tangential thinking. She was not suicidal. IQ was thought to be in the low-average range. Insight appeared to be limited and judgment appeared to be questionable. Psychomotor status was within normal limits. Exhibit 6F.

The claimant indicated to Dr. Doineau that she has been depressed off and on for years, but her depression had worsened since her ex-husband moved back to Tennessee about 8 or 9 months ago from Colorado. Apparently, she want to avoid him. The claimant stated, "He hurt me," and therefore, she wants to stay away from him. She thinks about the abuse that she suffered during their marriage whenever she has any kind of contact with him and becomes angry. The claimant stated she also hears a voice inside her head making derogatory comments off and on. She feels depressed sometimes and worries quite a bit about her parents, who are in bad health. She sleeps adequately once asleep, but has trouble getting to sleep. Her energy level fluctuates. Occasionally, she has trouble concentrating. Her appetite was described as increased, and she has gained about 30 pounds. She has no friends, and basically never had many. She does not trust people. She gives the impression that

people use you. She has interests, such as playing with her dog, reading, and photography. She is very apprehensive now about running into her ex-husband while in public. If she goes into crowded areas, she becomes nervous. She will go into stores, but prefers to go into stores where there are few people. She would go shopping at Kroger. She always feels that she has to keep her eye on her mother, who has rather significant medical problems. Exhibit 6F.

Regarding her activities of daily living, the claimant reported that she wakes up anywhere from 9 to 11 in the morning. She lets her dog out. She feeds the dog. She stays with her mother and talks to her. She prepares her parent's food. She does household chores on an as needed basis when she feels well enough to do so. She is not able to do a lot of work at one time, requiring the need to sit down and rest. She does the laundry. She runs errands for her mother. Primarily she looks after her mother during the day. She cooks dinner and eats with her parents. She does the dishes and goes to bed by 8:00 p.m. She reads her mail; keeps up with the appointments; makes decisions; looks after her personal needs; is able to pay bills, but has no funds; socializes with family; does not attend church; and grocery shops. She is able to initiate and complete perfunctory activities, unless hampered by her physical condition. Most days were described as the same. Exhibit 6F.

Dr. Doineau's diagnostic impression was major depressive disorder, single episode, moderate and anxiety disorder, NOS, with symptoms of post traumatic stress disorder. Her current Global Assessment of Functioning was estimated at 60, indicating moderate difficulty in social and/or occupational functioning. DSM-IV-TR (2000 text revision). The medical assessment was no limitation in understanding and remembering, mild limitation in sustaining concentration and pace; moderate limitation in social interaction, and mild limitation in adaptability. Exhibit 6F.

A Psychiatric Review Technique and Mental Residual Functional Capacity examination were completed by State Agency psychological consultant Richard S. Gross, Ph.D., who reviewed the evidence and reported that the claimant's affective disorder and anxiety disorder are both nonsevere. He found no restriction in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. Exhibit 7F.

In September 2008, State Agency psychological consultant Larry Welch, Ed. D., reviewed the evidence and affirmed Dr. Gross' decision as it was found to be technically and substantively correct. Exhibit 12F.

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

<u>Cruse v. Comm'r of Soc. Sec.</u>, 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., <u>Combs v. Comm'r of Soc. Sec.</u>, 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by

relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred by failing to consider all of her severe impairments. Specifically, plaintiff argues that the ALJ failed to consider whether her trochanteric bursitis, migraine headaches, and bipolar disorder are severe impairments, or, if he considered them to be nonsevere, failed to give sufficient reasons for such a finding. However, even a cursory review of the medical record reveals that plaintiff did not

consistently or even sporadically complain of problems related to her hip bursitis. The ALJ acknowledged that such impairment was diagnosed in June 1995 (Tr. 20), but appears to have concluded that this impairment did not merit discussion as one which would significantly impair her work-related functional abilities, and rightly so. Likewise, plaintiff points to only one occasion when she was diagnosed with and treated for migraine headaches (Docket Entry No. 12-1 at 8; Tr. 386-87). She did not complain about such headaches or her hip bursitis at the hearing before the ALJ, and such complaints were mentioned scarcely, if at all, in the paperwork plaintiff submitted to the agency in support of her claim. (Tr. 142-64)

As to plaintiff's diagnosed Bipolar Disorder, NOS (not otherwise specified), the ALJ found severe and recognized restrictions from plaintiff's symptoms of depression, anxiety, and post-traumatic stress disorder. While plaintiff mentioned at the hearing that she had recently been told she was bipolar (Tr. 41), no mental health records containing that diagnosis were supplied to the ALJ. Rather, the only evidence of plaintiff's bipolar diagnosis included in the record was dated in 2010 and first submitted to the Appeals Council. (Tr. 357)[2] Where, as here, the Appeals Council declines to review the merits of the claim -- leaving the ALJ's decision as the "final decision of the Commissioner of Social Security" subject to judicial review under 42 U.S.C. § 405(g) -- any evidence first submitted to the Appeals Council, having not been made available to the ALJ, is not properly considered by the Court on judicial review. Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996); see also Cotton v. Sullivan, 2 F.3d 692, 695-96 (6th Cir. 1993). Accordingly, lacking evidence

---

[2] Notably, the diagnosis is made by an advanced practice nurse, who is not an acceptable medical source capable of establishing the existence of a medically determinable impairment under the regulations. 20 C.F.R. § 404.1513.

15

of plaintiff's diagnosis of Bipolar Disorder, the ALJ did not err in failing to find that disorder among her severe impairments.

Plaintiff next argues that the ALJ minimized the severity of her back disorder and failed to give appropriate weight to the treatment notes of the doctors who treated her back. However, the ALJ recounted the evidence of plaintiff's cervical and lumbar spinal injuries; her courses of conservative and, ultimately, surgical treatment for those injuries; and, finally, her surgeons' respective releases of plaintiff back to light duty work with restrictions. (Tr. 20-21) The ALJ also noted that no evidence of continued medical treatment was available after January 2007. (Tr. 21) The ALJ considered plaintiff's testimony that she could perhaps perform sedentary work that allowed for frequent changes in posture (though she believed herself unqualified for such work), against the physical examination results and assessment of no impairment-related physical limitations by the consultative examiner, as well as the residual functional capacity assessments of the ability to perform light or even medium work by the nonexamining consultants. (Tr. 22-23) Giving significant credence to plaintiff's testimony as to her ability to lift, carry, sit, stand, and walk, the ALJ determined that plaintiff was more limited than the agency consultants had found, and more limited than even the treating physicians who had released her to light work apparently believed. (Tr. 23) The evidence from September 2010 which plaintiff cites in her brief (Docket Entry No. 12-1 at 8-9) and in her reply (Docket Entry No. 16) is not properly considered by this Court, as discussed above. E.g., Cline, 96 F.3d at 148. Accordingly, the undersigned finds that the ALJ gave due consideration to all medical evidence contained in the record before him, without minimizing the severity of plaintiff's back impairments, and properly determined plaintiff's residual functional capacity in light of substantial evidence of

plaintiff's ability to perform a limited range of sedentary exertional work. Although plaintiff claims that the ALJ failed to address the 2005 opinion of Dr. Wade that she is limited from doing more than occasional work at or above shoulder level (Docket Entry No. 12-1 at 12-13), the ALJ did recognize this limitation in his decision (Tr. 21) and included it in his hypothetical to the vocational expert. (Tr. 58, 60) The expert did not appear to regard this limitation as inconsistent with performance of the sedentary jobs (surveillance system monitor, sorter, and envelope stuffer) identified as existing in significant numbers in the economy.[3] Accordingly, there is no reversible error in the ALJ's consideration of the medical evidence or his finding of plaintiff's residual functional capacity.

While plaintiff purports to challenge the ALJ's finding as to the credibility of her subjective complaints (Docket Entry No. 12-1 at 10-11), her entire argument consists of boilerplate references to the standards for adjudicating a claimant's credibility and some common pitfalls, without any reference to the actual findings of the ALJ in her case, to wit:

> The undersigned has given the claimant's testimony some weight with regard to her ability to lift, carry, sit, stand, and walk by determining more restrictive limitations than those opined by Dr. Rinehart, State Agency consultants, and the claimant's treating physician. Considering the evidence as a whole, it does not appear that the claimant can perform even light work. However, the evidence supports the claimant's testimony finding that she is capable of lifting and/or carrying ten pounds; sitting in 25 minute intervals; standing and/or walking in one hour intervals; a[nd] requiring a sit/stand at will option every 25 minutes.

---

[3]Plaintiff, in her reply brief, "submit[s] that these positions are not limited to just one or two step repetitive tasks" (Docket Entry No. 16 at 4), and so do not comport with this element of the ALJ's finding of her residual functional capacity. However, plaintiff cites no authority whatsoever for this submission, which is in direct conflict with the expert testimony in this case. (Tr. 62) This argument is without merit.

(Tr. 23) The undersigned finds that the ALJ's credibility determination, which is due considerable deference on judicial review, e.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003), is well supported and was not arrived at erroneously.

Finally, plaintiff argues that the ALJ erred in failing to fully and fairly develop the record, in light of his heightened duty to do so given plaintiff's *pro se* status during the proceedings before him. Plaintiff asserts that "[a]lthough whether the Commissioner failed in its duty in this case is a close question, this record cries out for clarification." (Docket Entry No. 12-1 at 15) In particular, plaintiff points to the fact that, at the hearing, she testified that she had been seen at the Lawrence County Health Department, but no records were obtained or even requested from that provider. She further asserts that the list of evidentiary exhibits in the record contains only one page of evidence after 2008.

The undersigned respectfully disagrees with the proposition that the ALJ had a particularly heightened duty to develop the record in this case, or that he in any way failed to ensure the sufficiency of the record before him. As plaintiff herself notes, the Sixth Circuit applies careful scrutiny to the record where the claimant appears before the ALJ without counsel, but absent circumstances such as the claimant being uneducated, of limited intelligence, inarticulate, and easily confused, the Court would not typically reverse based on a relatively underdeveloped state of the record. See Lashley v. Sec'y of Health & Human Servs., 708 F.2d 1048, 1051-52 (6th Cir. 1983) (distinguishing Holden v. Califano, 641 F.2d 405 (6th Cir. 1981)). In this case, the claimant had a high school education, appeared to easily understand the issues in the case, was articulate and presented her case in an effective manner. Moreover, she indicated that her most recent visit to the Lawrence County Health

18

Department had been mainly to address "feminine issues" (Tr. 36-37), and other paperwork before the agency suggests that she had only been to the Health Department on a few occasions, and that all the Health Department could do was give her ibuprofen and Tramadol for her pain and refer her to other providers to follow up. (Tr. 226) Plaintiff's attorney likewise did not appear to regard any Lawrence County records as significant, as he did not produce such records in his submission to the Appeals Council. (Tr. 4) Plaintiff further testified that the last time she saw anybody for her back pain, which was her main issue, was in 2006. (Tr. 37, 38) In light of this testimony, and with the benefit of consultative examination reports and other assessments of agency consultants dated in 2008, the ALJ rightly regarded the record as fully and fairly developed.

In sum, the ALJ's decision in this case that plaintiff is significantly limited but not disabled by her impairments is supported by substantial evidence and deserving of affirmance.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections

within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 23rd day of December, 2014.

                                                s/ John S. Bryant
                                                JOHN S. BRYANT
                                                UNITED STATES MAGISTRATE JUDGE